UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I. CAROL WILLIAMS,<br><br>    Plaintiff,<br><br>v.<br><br>CHAD WOLF,<br><br>    Defendant. | Case No. 19-cv-00652-JCS<br><br>**ORDER REGARDING MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>Re: Dkt. No. 37 |

## I. INTRODUCTION

Plaintiff I. Carol Williams, who works as a paralegal for the Department of Homeland Security ("DHS"), asserts claims for racial discrimination and retaliation against Defendant Chad Wolf, Acting Secretary of Homeland Security (the "Secretary"). The Court previously granted a motion by the Secretary to dismiss Williams's claims with leave to amend. Williams filed an amended complaint, and the Secretary moves once again to dismiss. The Court held a hearing on March 13, 2020. For the reasons discussed below, the motion is GRANTED in part and DENIED in part. If Williams wishes to file a fourth amended complaint to pursue claims based on a theory of failure to promote, she may do so no later than March 30, 2020.[1]

## II. BACKGROUND

### A. Procedural History and Previous Order

Williams works as a paralegal specialist at the GS-11 salary grade for DHS at the U.S. Customs and Border Protection ("CBP") Fines, Penalties, and Forfeitures Office in San Francisco. This case is based on Williams's allegations that she was subjected to pretextual discipline, given negative performance reviews, and deprived of opportunities for professional advancement on

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

account of her African American race and in retaliation for her past efforts to raise such concerns.

Williams filed a grievance in June of 2015 and filed a complaint with the Office of Inspector General ("OIG") in September of 2016. 3d Am. Compl. ("TAC," dkt. 34) ¶¶ 12, 17. She contacted an Equal Employment Opportunity ("EEO") counselor on January 2, 2017 filed a formal EEO complaint on April 5, 2017. *Id.* ¶ 56.[2] Williams received a final decision on June 9, 2018 and filed an appeal to the Equal Employment Opportunity Commission ("EEOC") on June 22, 2018, but more than 180 days passed and she has not received a decision. *Id.* Williams again contacted an EEO counselor on April 20, 2018 and filed a second complaint on May 30, 2018, for which she received a final decision on November 21, 2018. *Id.* ¶ 57. Williams contacted an EEO counsel for a third time on November 16, 2018 and filed a third EEO complaint on December 17, 2018. *Id.* ¶ 58.

Williams filed this action on February 6, 2019. *See generally* Compl. (dkt. 1). She amended her complaint once before the Secretary was served, and a second time pursuant to a stipulation between the parties. *See generally* 1st Am. Compl. (dkt. 5); 2d Am. Compl. (dkt. 18).

On November 25, 2019, the Court granted the Secretary's motion to dismiss Williams's second amended complaint, but granted leave to amend. *See generally* Order Re Mot. to Dismiss 2d Am. Compl. ("Order re MTD SAC," dkt. 33).[3] The Court dismissed Williams's claims to the extent that they could be construed as encompassing her supervisors assigning her more difficult work beginning in January of 2017 and a 2018 email from a supervisor asserting that Williams violated the office dress code—an interpretation that Williams disavowed—because Williams did not exhaust any such claims by raising them with the EEO. *Id.* at 11–12. The Court held that Williams had sufficiently exhausted claims based on a June 2019 notification from supervisors that William was the subject of an investigation for poor work performance, holding that such

---

[2] Williams's present complaint states that she filed the EEO complaint on "April 5, 2016." TAC ¶ 56. Given the overall timeline of events, however, and the fact the EEO complaint allegedly pertained in part to conduct occurring in December of 2016 and January of 2017, it is clear in context that the year "2016" is a typographical error intended as "2017." *See id.*
[3] *Williams v. Wolf*, No. 19-cv-00652-JCS, 2019 WL 6311381 (N.D. Cal. Nov. 25, 2019). Citations herein to the Court's previous order refer to page numbers of the version filed in the Court's ECF docket.

2

claims were sufficiently similar to the subject matter of Williams's EEO complaints even though the conduct at issue occurred after Williams's contact with the EEO. *Id.* at 12–14.

The Court dismissed Williams's claims to the extent they could be construed as based on conduct occurring before November of 2016—again, an interpretation that Williams disavowed, arguing that she alleged such conduct only as background—for failure to timely complain to the EEO about such conduct. *Id.* at 14–15. The Court also declined to apply a "continuing violation" theory to the Secretary's failure to promote Williams, but held that she sufficiently alleged failure to promote at certain times within the statute of limitations, and granted Williams leave to amend to add a hostile work environment claim if she believed she could allege sufficient facts to do so. *Id.* at 15–17.

To the extent Williams based her claims on failure to promote her to the GS-12 salary grade, the Court dismissed them for failure to allege that an open position was available. *Id.* at 17–19. The Court granted leave to amend those claims if Williams could allege that the promotions in her office were made available in manner similar to cases recognizing that an open position need not be available to support a claim where "promotions [were] made available as a matter of course." *Id.* at 19 (citing *Hishon v. King & Spalding*, 467 U.S. 69 (1984); *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994)). The Court also granted the Secretary's motion to dismiss all of Williams's claims for failure to allege a plausible causal connection to race or retaliation, but noted that "Williams's current allegations would not require extensive amendment to meet that standard." *Id.* at 19–20.

Williams filed her operative third amended complaint on December 12, 2019, and the Secretary now moves once again to dismiss.

B. **Allegations of the Third Amended Complaint**

Because a plaintiff's factual allegations are generally taken as true in resolving a motion to dismiss, this background sections summarizes the allegations of Williams's complaint as if true. Nothing in this section should be interpreted as resolving any issue of fact that might be disputed at a later stage of the case.

Williams, who is African American, began working for CBP in the Fines, Penalties, and
3

Forfeitures Office as a GS-11 paralegal specialist in January of 2012. TAC ¶¶ 6–7. She has satisfactorily performed her duties and, before the events at issue, received consistently positive performance reviews. *Id.* ¶ 8. Williams is the only African American paralegal specialist in the office, and the only one who has complained about discrimination, harassment, or retaliation. *Id.* ¶ 40.

### 1. Background Conduct Not Timely Presented to the EEO

The director of Williams's office, Richard Holsopple, "denied her an opportunity to attend Basic Training as a Paralegal Specialist for approximately three years from her date of hire," with Williams only receiving that training after someone at DHS headquarters in Washington, DC noticed that she had not yet done so and ordered her to complete the training in April of 2015. *Id.* ¶ 9. Holsopple had requested basic training for another paralegal specialist, who was white, in December of 2014. *Id.* Holsopple also later requested basic training for another white paralegal specialist within two years after her date of hire, at the first available opportunity. *Id.*

Beginning in June of 2015, Williams repeatedly requested permission to participate in temporary duty assignments, which are relevant to paralegal specialists' consideration for promotion, but was denied by Holsopple and another supervisor, Debra Zeng. *Id.* ¶ 10. Another paralegal specialist, "Alvin To, who is Chinese American," was approved for a temporary duty assignment shortly after Williams's third request was denied in May of 2016. *Id.*

In June of 2015, Williams filed a grievance against Holsopple and Zeng for "willfully obstructing her right to compete for employment." *Id.* ¶ 12. In September of 2015, Williams sent Holsopple and Zeng a memorandum stating "her position that she would consider as workplace harassment and retaliation a failure by Ms. Zeng and Mr. Holsopple to establish a professional and respectful relationship with her and/or continuation of criticism of her alleged lack of work productivity/performance." *Id.* ¶ 13. In December of 2015, and unbeknownst to Williams at the time, Zeng told another paralegal specialist, Xenia Mannone, that "Zeng could never support a certain GS-11 paralegal who had filed a grievance against Ms. Zeng (i.e., Ms. Williams) for advancement to GS-12." *Id.* ¶ 14.

"One way that the Fines, Penalties, and Forfeitures San Francisco Office promotes

employees in that Mr. Holsopple identifies a need for the office and then approaches management and requests promotion(s)/position(s) within the office. Mr. Holsopple's requests are routinely granted." *Id.* ¶ 11. Williams told Zeng in January of 2016 that she was interested in promotion to the GS-12 salary grade and would like Zeng's assistance, including for Zeng to speak with Holsopple. *Id.* ¶ 15. Zeng and Holsopple nevertheless denied Williams's requests to work temporary duty assignments in other offices in March and May of 2016. *Id.* ¶ 16.

As discussed above, the Secretary previously moved to dismiss claims based on the conduct addressed thus far for failure to make a timely administrative claim, Williams disavowed any claims based on denials of training or temporary duty assignments, and the Court granted the Secretary's motion to dismiss claims based on conduct occurring through September of 2016, although the Court noted that Williams could "present past conduct that was not timely presented to the EEO 'as background evidence in support of a timely claim.'" *See* Order re MTD SAC at 15–17 (quoting *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). The remaining conduct addressed below occurred within or after the forty-five-day period before Williams's first contact with the EEO.

## 2. Events Preceding First EEO Complaint

Williams filed her complaint with the OIG in September of 2016 alleging systematic racial discrimination and retaliation by Zeng and Holsopple that prevented her from obtaining a promotion to GS-12, and amended her complaint within days to add the statements that Zeng made to Mannone, which Williams first learned of at that time. TAC ¶ 17.

On November 9, 2016, Williams met with Zeng for an annual performance review, and after Williams noticed handwritten notes on the evaluation document, Zeng told her that her work was generally good except for a lack of attention to detail. *Id.* ¶ 18. Williams said that she did not want to participate in the performance review until her OIG complaint was resolved, which Zeng agreed "was fine." *Id.* The following day, Holsopple asked to meet with Williams and Zeng about the performance review, and Williams asked for a third-party representative and to postpone the meeting—requests that Holsopple denied. *Id.* ¶ 19. It is not clear from the complaint whether the meeting occurred.

Around two weeks later, on November 23, 2016, Williams gave the OIG consent to reveal her identity with respect to her pending complaint. *Id.* ¶ 20. Two days after that, Williams met with Zeng to complete the performance review, and Zeng issued the review, which contained negative comments for the first time in Williams's tenure with the Fines, Penalties, and Forfeitures Office. *Id.* ¶ 20

On December 22, 2016, Holsopple issued Williams "a Letter of Reprimand for an alleged failure to follow the lawful direction of a supervisor with respect to the November 9 meeting with Ms. Zeng and the November 10 conversation with Mr. Holsopple." *Id.* ¶ 23. Williams asserts that she did not fail to follow an instruction with respect to the November 9th meeting because Zeng agreed to postpone it, but does not address whether she violated instructions with respect to the November 10th conversation with Holsopple. *Id.* Williams responded to the Letter of Reprimand with a letter stating that she considered the reprimand to be "an ongoing and continuous written form of workplace discrimination and workplace retaliatory practice and procedure." *Id.*

On December 7, 2016, Zeng issued Williams a "Memorandum of Instruction" regarding other employees' complaints that Williams and her coworker Xenia Mannone engaged in long conversations unrelated to work. *Id.* ¶ 22. Williams disputed the allegations and complained to Zeng about discrimination and harassment. *Id.*

On January 24, 2017, Zeng asked Williams to meet with her and Holsopple "regarding an alleged long conversation between Ms. Williams and Ms. Mannone" purportedly unrelated to work, but at the meeting, Williams "explained that they were discussing work matters." *Id.* ¶ 24. Williams notes that this meeting occurred after Zeng and Holsopple were aware of her OIG complaint for which Mannone was a supporting witness. *Id.*

On January 2, 2017, Williams contacted an EEO counselor and "raised the issues of race discrimination and retaliation with respect to the negative comments in her 2016 Employee Proficiency Review; the December 7, 2016 Memorandum of Instruction; the December 22, 2016 Letter of Reprimand; and the January 24, 2017 request to meet with her supervisors." *Id.* ¶ 56. She filed a formal complaint on April 5, 2017 and received a final decision on June 9, 2018. *Id.* Williams filed a notice of appeal to the EEOC on June 22, 2018, but did not receive a decision

within 180 days. *Id.*

### 3. Events Preceding Second EEO Complaint

Since January of 2017, Zang and Holsopple have assigned more difficult and complex work to Williams than to other GS-11 paralegal specialists, who are no more senior and have shown no better job performance than Williams. *Id.* ¶ 25. Williams's work was at least equally complex and difficult to the work of GS-12 paralegal specialist Alvin To, and Williams had a caseload nearly twice the size of To's, becoming three times the size of his in 2019. *Id.*

In the summer of 2017, Director of Field Operations Brian Humphrey stated that some paralegals in the San Francisco Fines, Penalties, and Forfeitures Office would receive promotions to GS-12. *Id.* ¶ 27. From November of 2017 through December of 2019, Holsopple "began what he claimed was mentoring and monthly meetings with Ms. Williams for the purported purpose of positioning her for a promotion to a GS-12 Paralegal Specialist position." *Id.* ¶ 27. Holsopple stated in staff meetings in the fall of 2017 and throughout 2018 that there would be new GS-12 positions in the San Francisco office. *Id.* ¶ 31.

On February 16, 2018, Zeng accused Williams of violating the office dress code. *Id.* ¶ 28. Williams responded that her coworkers routinely violated the dress code and asked Zeng and Holsopple to apply the policy fairly rather than in a discriminatory or retaliatory manner. *Id.* Zeng and Holsopple required Williams to meet with them on the subject, and Zeng said that another employee told her that Williams had a hole in her shirt. *Id.* ¶ 29. Williams said that she was not aware of the hole, suggested that Zeng could have simply told her that, and reiterated her position that accusing her of violating the dress code was discriminatory and retaliatory. *Id.*

Todd Owen, a senior DHS official, visited the San Francisco office in March of 2018 and stated that GS-12 positions would be made available nationwide. *Id.* ¶ 30. Based on that visit, Brian Humphrey's announcement in 2017, and Holsopple's repeated statements and mentoring, "Williams was led to believe that GS-12 Paralegal Specialist positions would be made available for the San Francisco Office." *Id.* ¶ 30.

On April 20, 2018, Williams contacted an EEO counsel for the second time and "raised the issues of race discrimination and retaliation with respect to being denied a promotion to a GS-12

7

Paralegal Specialist position and the ability to be promoted to an attorney position as [a] continuing violation since December 14, 2015." *Id.* ¶ 57. She filed a formal complaint on May 30, 2018, and received a final decision on November 21, 2018. *Id.*

### 4. Events Preceding Third EEO Complaint

On November 6, 2018, Owen announced new GS-12 paralegal positions in eight offices, but none in San Francisco. *Id.* ¶ 32. Williams met with Holsopple two days later to discuss the fact that no GS-12 positions were created in San Francisco, to request that she be considered for such a position, and to express her desire to make her concerns known to Owen and Humphrey. *Id.* ¶ 33. Holsopple told Williams that Humphrey had the authority to create new positions. *Id.* "Williams memorialized the meeting in an email she sent that day," apparently to members of the "Executive Commission." *Id.*; *see id.* ¶ 34.

On November 14, 2018, Holsopple asked to meet with Williams regarding her email, and ordered her to meet with him after she initially declined to do so. *Id.* ¶ 34. With Assistant Port Director Steven Baxter present at the meeting, Holsopple issued Williams a "Letter of Caution" for purportedly failing to follow instructions and using poor judgment in circumventing the chain of command. *Id.* Williams disputes that conclusion. *Id.*

On November 16, 2018, Williams contacted an EEO counselor for the third time and "raised the issues of race discrimination and retaliation with respect to being denied a promotion to a GS-12 Paralegal Specialist position on November 6, 2018 and as a continuing violation since December 14, 2015, being denied the ability to [be] promoted to an attorney position as [a] continuing violation since December 14, 2015, and the November 14, 2018 Letter of Caution." *Id.* ¶ 58. She filed a formal complaint on December 17, 2018, and more than 180 days have elapsed since then without DHS reaching a final decision.

### 5. Events Following Third EEO Complaint and Filing of Civil Action

Williams filed this action on February 6, 2019. The same day, "Holsopple announced the hiring of Timothy Smith, who is white and has not complained of discrimination, harassment, or retaliation, as a GS-12 Supervisory Paralegal Specialist." *Id.* ¶ 45. Smith lacked experience or training as a paralegal and had previously had his supervisory responsibilities revoked in a

8

different GS-12 position after an employee filed a sexual harassment complaint against him. *Id.* Holsopple nevertheless requested the GS-12 Supervisory Paralegal Specialist position, hired Smith, and "immediately began 'on-the-job' training." *Id.* Smith had also previously been investigated "for allegedly threatening to shoot a supervisor and several co-workers in the heads." *Id.* ¶ 52.

On March 6, 2019, Owen visited the San Francisco office again and announced that "a team assembled in Washington DC Headquarters would reconsider GS-12 Paralegal Specialist positions for Fines, Penalties and Forfeitures Offices nationwide." *Id.* ¶ 35.

On June 13, 2019, Zeng presented Williams with a "General Notice" stating that Williams was the subject of an investigation for "neglect of duty and failure to follow instructions" with respect to five sets of cases that Williams worked on. *Id.* ¶ 36. Williams alleges that she followed instructions in her work on those cases by successfully producing a template for them that Holsopple distributed to other paralegals and thanked her for a few weeks earlier, and by contacting Homeland Security Investigations agents at Holsopple's request. *Id.* ¶¶ 36–37. Williams had received a uniformly positive mid-year performance review a few weeks before Zeng issued her the General Notice. *Id.* ¶ 38.

On August 23 and 27, 2019, Holsopple ordered Williams to stop complaining about a new database, but all of the paralegals complain about the database and he has not similarly directed other paralegals to cease complaining. *Id.* ¶ 46.

On October 16, 2019, Williams met with Smith, the new Supervisory Paralegal Specialist, for Williams's annual performance review, which was entirely positive. *Id.* ¶ 47. Smith noted that Williams works quietly, and Williams responded that she makes an effort to do so to avoid reprimands like she has received in the past for conversations at work, even though other paralegals (as well as Zeng and Holsopple) frequently talk about non-work-related matters. *Id.*

Although Williams's job performance has met or exceeded that of all of the other paralegal specialists—none of whom are African American or have complained of discrimination or retaliation—no other paralegal specialist in Williams's office "has been disciplined in the same manner as Ms. Williams, i.e., a series of Memorandum of Instruction, Letter of Reprimand, Letter

9

of Caution, disciplinary meetings, and General Conduct investigation concerning alleged performance issues and improper interactions with co-workers." *Id.* ¶ 40. All other employees in Williams's office have been promoted since she was hired (except one employee who never sought promotion and retired in 2018), but Williams remains a GS-11 paralegal specialist as of the date of her third amended complaint. *Id.* ¶ 39.

On November 13, 2019, Owens announced that all Office of Field Operations Paralegal Specialist positions would be upgraded to the GS-12 salary grade effective in December of 2019. *Id.* ¶ 48. Williams notes that although this change will result in her reaching that grade, it will have the same effect on other employees who have less job experience, have not received years of "sham 'mentoring,'" are not African American, have not complained of discrimination or retaliation, and have not taken legal action. *Id.* ¶ 48. Owens also announced that "First Line Supervisory Paralegal Specialist positions," including Timothy Smith's, would be upgraded from GS-12 to GS-13. *Id.* ¶ 52.

On three occasions in November and December of 2019, Holsopple instructed Williams (who is a licensed attorney) not to use "J.D., Esq." or "Paralegal Specialist" in the signature block of her emails, even though "other DHS employees nationwide use degrees in their signature block," and Holsopple has not instructed other employees to cease doing so. *Id.* ¶ 53. Williams asked Holsopple to forward a request to his superiors for guidance on this policy, but Holsopple did not do so. *Id.* ¶¶ 53–54.

Williams emailed Holsopple on November 26, 2019 to state that she would no longer participate in their "mentoring" meetings that had been occurring since 2017, which Williams understood to be voluntary. *Id.* ¶ 55. Holsopple ordered her to continue attending the meetings, and Williams did so out of fear of receiving a disciplinary letter. *Id.*

### 6. Hiring and Promotion Practices, and Williams's Job Search

Williams alleges the following hiring and promotion practices occurred in her office:

> Mr. Holsopple has requested and received approval for a number of positions in the Fines, Penalties and Forfeitures Office based on the needs of the office. For example, Mr. Holsopple requested and received approval to create the following: (1) a GS-12 "Legal Expert" (Paralegal Specialist) position in or about 2014 or 2015 that was given

to Mr. To; (2) a GS-12 supervisor position in 2017 that was given to Maria Gastellum, who is Mexican American; (3) a GS-12 supervisory position in February 2019 that was given to Timothy Smith, who is white; (4) two GS-11 Paralegal Specialist positions, one in June 2015 that was given to Lori Whipple, who is white, and one in November 2018 that was given to Theresa Benitez, who is Filipina American; (5) a GS-9 Paralegal Specialist position in or about January 2019 that was given to Kim Urban, who is white (and after one year, will be promoted to a GS-11 and will be eligible for a GS-12 Paralegal Specialist in or about 2021) following an agreement she entered into with Upper Management after she was terminated from her job as a U.S. Customs and Border Protection Officer at the San Francisco International Airport and offered an opportunity to apply to the Fines, Penalties and Forfeitures department as a GS-9 Paralegal Specialist; and (6) two case assistant positions in or about 2016 and 2018 that were given to Kathleen Malolot and Josie Callejo, respectively, both of whom are Filipina Americans and did not go through the competitive process of applying and interviewing for their positions but were "placed" in the office because their positions in their prior departments became obsolete.

*Id.* ¶ 41. Holsopple has not requested a GS-12 position for Williams, even after she expressed interest in such a position, after senior DHS officials indicated in 2017 that more GS-12 positions would be made available, and after Holsopple "mentored" Williams for more than two years purportedly in preparation for such a position. *Id.* Zeng has also had "authority to recommend promotions and changes in job responsibilities" at all relevant times, but has not requested a GS-12 position for Williams. *Id.* ¶ 42.

Holding a GS-12 position is a prerequisite for promotion to many attorney positions in the GS-13 salary grade at DHS, and Williams is the only licensed attorney working as a paralegal specialist in her office. *Id.* ¶¶ 43, 49.

Williams has sought other employment with the federal government since 2016 in order to escape the alleged harassment and retaliation by Holsopple and Zeng, but alleges that she has been unsuccessful because of the disciplinary letters in her file and because the supervised she must list as references are biased against her. *Id.* ¶ 51. Other employees from her office have obtained higher-paid positions at different federal government offices during the time period at issue. *Id.*

### 7. **Williams's Claims for Relief**

Williams brings two claims under Title VII of the Civil Rights Act of 1964: first, for retaliation; and second, for discrimination on the basis of race. *See id.* ¶¶ 59–62. Both claims are based on the following adverse employment actions: "(1) unprecedented negative performance

11

1  review on November 25, 2016; (2) Memorandum of Instruction on December 7, 2016; (3) Letter
2  of Reprimand on December 22, 2016; (4) accusation of alleged misconduct on January 24, 2017;
3  (5) investigation of alleged misconduct starting on June 13, 2019; and (6) denial of promotion on
4  November 6, 2018." *Id.* ¶¶ 60, 62.

### III. ANALYSIS

#### A. Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the

12

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B. Claims Based on Failure to Promote

As discussed in the Court's previous order, a number of district courts have held that an employee cannot bring a discrimination claim based on an employer's failure to create a "new position" for that employee. Order Re MTD SAC at 17–18 (citing *Hamilton v. St. Joseph's Med. Ctr.*, No. CIV. S-12-2817 KJM, 2014 WL 2624976, at *6 (E.D. Cal. June 12, 2014); *McQuilkin v. Del. River Port Auth.*, No. CIV. 11-652 JBS/AMD, 2013 WL 5936983, at *14 (D.N.J. Nov. 6, 2013); *Oyola-Nunez v. Miranda-Marin*, No. CIV. 08-2149 (JAF), 2009 WL 1299561, at *4 (D.P.R. May 5, 2009); *Bernstein v. The MONY Grp., Inc.*, 228 F. Supp. 2d 415, 419 (S.D.N.Y. 2002)). Comparing those cases to other decisions allowing claims where employers typically promoted employees "as a matter of course" but failed to do so for the plaintiffs, the Court noted that Williams's second amended complaint "d[id] not indicate whether Holsopple requested [new GS-12] positions based on the needs of the office, which would be more similar to the cases holding that employers need not create 'entirely new positions' to accommodate an employee's desired roles, or based on his view that employees had reached a point in their careers where they deserved greater compensation and responsibility, which might be more similar to the promotions made available as a matter of course." *Id.* at 18–19 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 71–79 (1984); *Lloyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994)). The Court dismissed with leave to amend Williams's claims based on failure to promote.

Williams does not dispute as a matter of law that an employer need not create an entirely new position for an employee if the employer has no need for that position. Nor does she square her new allegation that Holsopple requested new positions "based on the needs of the office," *see* TAC ¶ 41, with the Court's previous holding that such a practice would fall within the realm of creating new positions rather than promotion as a matter of course. *See* Opp'n at 15. There is no allegation that any GS-12 "Paralegal Specialist (Legal Expert)" positions—the position that Williams now claims she should have received—were available or created in the San Francisco office during the period at issue, that Williams ever applied for a vacant position, or that the office

had a need for such a position. If, as alleged, DHS typically created new positions based on office needs and Williams's office neither had a vacant GS-12 "Paralegal Specialist (Legal Expert)" position nor needed to add such a position, then as a matter of law, failure to offer such a position to Williams was neither discriminatory nor retaliatory

The closest that Williams comes to suggesting that such a position was available or needed is her allegation that Timothy Smith was hired as a GS-12 "Supervisory Paralegal Specialist" in February of 2019. *See* TAC ¶ 45. That is a different title than Williams alleges she sought, however, and Williams does not allege that she pursued or was qualified the "supervisory" position offered to Smith. Williams also does not allege that Smith received the role through anything other than a competitive application process. To the contrary, her allegation that two employees, whose previous roles in other departments became obsolete, received "case assistant" positions without "go[ing] through the competitive process of applying and interviewing for their positions"—presented in a paragraph describing the hiring or promotion of a number of other employees, including Smith, with no suggestion that other employees received similar treatment—tends to suggest that the other employees, including Smith, applied and interviewed for the positions they received. *See id.* ¶ 41. There is no indication in the complaint that Williams applied for the position ultimately offered to Smith, and at the hearing, Williams's counsel stated that he was not aware of her having done so.

Based on Williams's allegation that new GS-12 "Paralegal Specialist (Legal Expert)" positions were created based on the needs of the office rather than as a matter of course for experienced GS-11 paralegal specialists, and her failure to allege that any such position was available during the period at issue, Williams's claims are DISMISSED to the extent they are based on failure to promote. Although there appears to have been some confusion and conflicting information as to whether new GS-12 paralegal specialist positions would be authorized for the San Francisco office, there is no indication that the ultimate decision by DHS officials in Washington to authorize those positions for different offices instead of San Francisco was motivated by Williams's race or protected activity. It remains conceivable that Williams could amend to cure this defect, and the Court grants her leave to do so.

14

## C. Claims Based on Other Adverse Actions

Setting aside the failure to promote, the remaining adverse employment actions on which Williams bases her claims are: "(1) unprecedented negative performance review on November 25, 2016; (2) Memorandum of Instruction on December 7, 2016; (3) Letter of Reprimand on December 22, 2016; (4) accusation of alleged misconduct on January 24, 2017; (5) investigation of alleged misconduct starting on June 13, 2019; and (6) denial of promotion on November 6, 2018." TAC ¶¶ 60, 62.

In the context of summary judgment, which this case has not yet reached, courts "analyze plaintiffs' Title VII claims through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)," under which a plaintiff must first present a prima facie case of discrimination, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the challenged action," and if the defendant does so, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (citations and internal quotation marks omitted). "To establish a prima facie case, plaintiffs must offer evidence that gives rise to an inference of unlawful discrimination," which they may do with "circumstantial evidence by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* at 1156 (citations, internal quotation marks, and brackets omitted).

The *McDonnell Douglas* framework does not apply at the pleading stage. *Austin v. Univ. or Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019) (considering a claim for sex discrimination in education under Title IX, which applies the same standard). The Supreme Court so held in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002), and the Ninth Circuit has reaffirmed that rule after the Supreme Court's decisions in *Iqbal* and *Twombly* setting forth the "plausibility" pleading standard, most recently last year in *Austin*. *See* 925 F.3d at 1136–37. Notably, the

15

rejection of *McDonnell Douglas* at the pleading stage is not limited to its burden-shifting framework, which is plainly inapplicable, but *Swierkiewicz* and *Austin* also hold that a plaintiff's allegations need not track *McDonnell Douglas*'s elements of a prima facie case. *See id.* (quoting *Swierkiewicz*, 534 U.S. at 511). That said, a plaintiff's complaint still must include "sufficient, nonconclusory allegations plausibly linking the [adverse] action to discrimination" or retaliation. *Id.* at 1138.

The Secretary does not dispute, at least for the purpose of this motion, that the incidents identified in Williams's complaint rise to the level of cognizable adverse actions, but instead argues that Williams has not shown a causal connection to her race or protected activity. *See* Mot. at 12–18; Reply at 7–13. The parties also dispute whether Williams must show a causal connection for each adverse action individually, or whether causation may be inferred from the fact that no other paralegal specialist experienced the same overall pattern of discipline. *See* Opp'n at 20–21; Reply at 6.

In light of the Ninth Circuit's most recent disavowal of applying the *McDonnell Douglas* prima facie case elements to a plaintiff's allegations at the pleading stage, the Court takes a broader view of causation than the Secretary's approach of looking for other similarly situated employees for each individual adverse action. Williams has identified a number of incidents where a retaliatory or discriminatory motive can plausibly be inferred. Zeng's statement to Xenia Mannone that she would never support a promotion for the paralegal who had filed a grievance against her (i.e., Williams) is the clearest example. *See* TAC ¶ 14. Williams also alleges that she has been singled out for criticism or discipline on a number of occasions for conduct that is common in her office by non-African American employees who have not engaged in protected conduct, including non-work-related conversations, *see id.* ¶¶ 24, 47, violation of the office dress code, *id.* ¶¶ 28–29, and identifying her education credentials in her email signature, *id.* ¶¶ 53–54. Although most of those incidents did not directly give rise to the adverse actions on which Williams bases her claims, and the Court holds for the reasons discussed separately above that Williams has not stated a claim for failure to promote, these incidents nevertheless provide at least some support for an inference that Zeng and Holsopple harbored retaliatory or discriminatory

16

animus against Williams. That purported animus, coupled with Williams's new allegations that her work performance was as good or better than that of her peers, *see, e.g.*, *id.* ¶¶ 25, 40, supports a sufficiently plausible inference that the November 2016 negative performance review, December 2016 Memorandum of Instruction and Letter of Reprimand, January 2017 meeting to reprimand Williams for her conversation with Mannone, and June 2019 notice of investigation for neglect of duty were motivated at least in part in part by retaliation or discrimination. *See, e.g.*, *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 848 (9th Cir. 2002) (en banc) ("'[A]n unlawful employment practice" encompasses any situation in which a protected characteristic was 'a motivating factor' in an employment action, even if there were other motives."); *see also Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067 (9th Cir. 2003) (as amended Jan. 6, 2004) (citing this "mixed motive" test in the context of Title VII retaliation).

In light of the Ninth Circuit's holding that the *McDonnel Douglas* test for a prima facie case does not apply at the pleading stage, the Court has no occasion to consider whether Williams's present allegations meet that standard, or whether evidence showing no more than these factual allegations would be sufficient to survive summary judgment. Regardless, Williams's allegations are sufficient to deny the Secretary's motion to dismiss and allow her to pursue discovery.

## IV. CONCLUSION

For the reasons discussed above, the Secretary's motion is GRANTED as to claims based on failure to promote, which are DISMISSED with leave to amend no later than March 30, 2020, but the motion is DENIED with respect to claims based on other adverse actions.

**IT IS SO ORDERED.**

Dated: March 16, 2020

JOSEPH C. SPERO
Chief Magistrate Judge

17